OTTO TIMME, Trading as E. F. TIMME & SON, Respondent, v. LEO STEINFELD and Another, Appellants.

First Department, December 18, 1925.

Sales — action by seller for breach — verdict. in favor of plaintiff on question of cancellation of contract not against evidence — delivery was extended by mutual consent indefinitely — no action was taken thereafter by either party for about eighteen months when seller demanded that buyer accept goods — as matter of law delay in making demand is unreasonable — contract mutually abandoned.

In an action by a seller to recover damages for breach of a contract for the sale of goods, in which the defendant pleaded that the contract was canceled by mutual consent, the verdict of the jury in favor of the plaintiff on the issue of cancellation is not against the weight of the evidence which was furnished entirely by interested witnesses on both sides.

An indefinite extension of the time for the delivery of the goods of fluctuating market value required the seller to tender the goods and demand acceptance on the part of the buyer within a reasonable time thereafter, and since it appears that after the indefinite extension of time for delivery neither party made any claim under the contract for nearly eighteen months, at which time the seller demanded that the buyer accept the goods, it will be held, as a matter of law, that the seller lost his right to demand acceptance because of the unreasonable delay, and that the action of the parties in not proceeding under the contract for so long a time is evidence of the mutual abandonment thereof.

APPEAL by the defendants, Leo Steinfeld and another, from a judgment of the Supreme Court in favor of the plaintiff, entered in the office of the clerk of the county of New York on the 8th day of May, 1924, upon the verdict of a jury, and also from an order entered in said clerk's office on the 6th day of June, 1924, denying defendants' motion for a new trial made upon the minutes.

*Weill, Wolff & Satterlee* [*William Gilligan* of counsel; *Henry F. Wolff* with him on the brief], for the appellants.

*Douglass Newman,* for the respondent.

DOWLING, J.:

This action is brought to recover damages for the alleged breach by defendants of a contract made on or about December 31, 1919, whereby plaintiff agreed to sell and deliver to defendants 250 pieces of cinnamon teddy bear plush, and defendants agreed to purchase the same and to pay therefor at the rate of three dollars and thirty-five cents per yard, in rolls of 40 to 50 yards, delivery to be made during the months of January, February and March, 1920. The complaint sets forth that plaintiff duly delivered to defendants one hundred and eighty-three pieces of the plush,

totalling 7,949⅞ yards for which defendants paid; that this left undelivered sixty-seven pieces of plush, containing 2,697 yards; that at the special instance and request of defendants, on February 28, 1920, plaintiff withheld the delivery of the balance of the merchandise to be delivered under the aforesaid agreement and mutually agreed with the defendants that the time for the delivery of the aforesaid balance of said merchandise should be temporarily postponed; that on February twenty-eighth ₒwhen said request was made, plaintiff stated to defendants that there were thirty pieces of said merchandise in transit and defendants agreed to take in said thirty pieces and did take them in and paid therefor.

The complaint further sets forth that thereafter and on or about the 7th day of October, 1921, the defendants repudiated their agreement and stated that they refused, and would refuse, absolutely to accept the balance of merchandise or any part thereof, although plaintiff was ready, willing and able and offered to deliver the same to defendants.

Upon the trial the following facts appeared: Plaintiff was a manufacturer of plushes and defendants were factors and jobbers in toys and novelties. The contract in question was reduced to writing and is as follows:

" (Letterhead of Steinfeld Bros.)
" NEW YORK, *December thirty-first*, 1919.
" E. F. TIMME & SON,
    " 251 Fourth Avenue,
        " New York City:
" GENTLEMEN.— In accordance with agreement made this day with your Mr. Fred Nauman, you may enter our order for: 250 pcs. #537 Cinnamon Teddy Bear Plush 50" wide and about 40 yds. to 50 yds. to a roll, at 3.35 yd.

" Delivery to be made during the months of Jan., Feb. and March, 1920, and to be in accordance with sample submitted and accepted by us.

" Terms, 8% for payment after delivery of merchandise to ourselves at the above address or to our factory, as we may designate.

                                        " STEINFELD BROS.
" E. F. TIMME & SON
        " Accepted, FRED NAUMAN."

The rate of discount is claimed to have been changed by mutual consent to seven per cent.

There is no dispute as to the amount of plush delivered, nor that payment was made therefor in accordance with the contract,

which was carried out until February 28, 1920, when defendants wrote the following letter to plaintiff:

" (Letterhead of Steinfeld Bros.)
" NEW YORK, *February 28th*, 1920.
" In reply refer to AD /11

" E. F. TIMME & SON,
     " 251 4th Ave.,
          " New York City:

" GENTLEMEN.— As explained to you previously, our storage facilities are very limited, and after receiving the cases that you have sent us up to the present time, we find that we have not an inch of space for additional merchandise.

" Under the circumstances, we would appreciate your withholding shipment until we advise you, as at present we would not know just what to do with the goods if they did arrive.

" We trust that you can accommodate us by holding up shipment a little while.
               " Very truly yours,
                    " STEINFELD BROS."

The versions of what happened after this, as given by plaintiff's witness Nauman and defendants' witness Demov, vary considerably. Demov was defendants' buyer. He claimed that he had had conversations with Nauman about the general conditions of the plush market, and about defendants' lack of storage space and asked him not to crowd them, but to hold off, to go easy, which Nauman promised to do, but as the deliveries kept coming in as fast as ever during February, the above letter was written, in which reference is made to those prior conversations. Demov then testified: " Why, several days after I sent that letter to E. F. Timme & Son, I received a telephone call, and Mr. Nauman was on the telephone. He said, ' How about shipping instructions? ' I says, ' Mr. Nauman, be a little reasonable. I have not got room now. Why not work with me and just as soon as I have a little space I will take the goods in. I want the goods. We need the goods and we will take the goods in.' And Mr. Nauman said, ' We can't hold the goods. Other merchants are clamoring for this merchandise, and if you cannot give me shipping instructions now, why, I can dispose of it at a higher price.' "

Demov suspended the telephone conversation long enough to report it to defendant Steinfeld and returning to the telephone, he said: " I continued my conversation with Mr. Nauman and I says, ' Nauman, if you cannot hold off as I requested you, then the best thing for you to do is to sell the stuff and consider the order cancelled.' He said, ' Fine, I will take it up with Mr. Timme

and let you know tomorrow.' Q. Did you talk to him on the following day? A. Tomorrow came, and the following day Mr. Nauman called me up or I called him up and asked him, ' How did you make out? ' And he said Mr. Timme O. K.'d it and accepted the cancellation."

Thereafter Demov claimed to have received a telephone message from plaintiff's office asking that the defendants take in thirty pieces of goods which were then *en route;* and these goods were taken in with the understanding that " there were no more shipped, no more *en route,* and the cancellation stood." These goods were paid for. Demov testified that thereafter nothing was said or heard about the contract or deliveries thereunder until September, 1921. In this he is corroborated by Leo Steinfeld. Then the following letter was sent to defendants:

" Cable Address: ' Mercadit.'

" Nathaniel Walkof       Telephone 320 Franklin
" Austin McNeal       321

" Merchants Credit Adjustment Co.
" Adjustments and Collections
" 366 Broadway
" New York
" Creditors' Interests Only

" *September 8th,* 1921.

" Messrs. Steinfeld Bros.,
      " 116 West 32nd Street
         " New York City:
        " In re: E. F. Timme & Son vs. You
          " 18274.

" Gentlemen.— The above matter has been handed us for attention. We should like to discuss the matter with you. Clients tell us that they have been holding merchandise for you of an invoice value of $9,651.35.

" We trust you will get in touch with us as soon as possible.
         " Very truly yours,
" I/BW.       MERCHANTS CREDIT ADJ. CO."

To this defendants replied:

" (Letterhead of Steinfeld Bros.)

" New York, *September 14th,* 1921.
" In reply refer to AD/11

" Merchants Credit Adjustment Co.,
      " 366 Broadway,
        " New York City:

" Gentlemen.— In reply to your communication dated Sept. 8th regarding the matter of E. F. Timme & Son wish to state that

it was agreed last year between Mr. Fred Nauman and the writer that the balance of the order was to be cancelled.

" We still have a very large amount of the Plush on hand which we are unable to dispose of.

" Yours very truly,<br>" STEINFELD BROS."

More correspondence followed between the parties, defendants claiming that the balance of the order was canceled, the credit company claiming that Nauman had no authority to accept cancellations.   No result was reached.

On the other hand, Fred Nauman denied that he had any conversation with Demov after the letter of February twenty-eighth. He testified that on May 3, 1920, he had a telephone conversation with Demov, in which he asked Demov whether he could take in some goods.   Demov said " No," they were just as crowded then as they were before.   Nauman asked Demov whether plaintiff could store the goods for them and the latter replied: " Nothing of the kind."

John Bobsin, plaintiff's order clerk, testified that after defendants' letter of February 28, 1920, was received at plaintiff's office, " I called up Mr. Demov and told him I had received a letter, and that we would be pleased to help them out and hold up the goods for a while, but a big number of pieces were in transit at that time, and we wanted instructions regarding those."   These were the thirty pieces which defendants took in and paid for after the date of their letter, and of the six cases then delivered they were able to take in two at their own place of business, the other four cases being taken in and stored for them at another place.   He denied that anything was ever said to him about the balance of the order being canceled.

Nothing more was ever done by plaintiff about the balance of the order.

Plaintiff concededly never made tender of performance by tendering the balance of sixty-seven pieces of plush due under the contract.   He claims that the time of delivery having been waived, neither party could put the other in default without giving notice specifying a reasonable time of delivery, and furthermore that as defendants had been guilty of an anticipatory breach of the contract, by abandoning it, plaintiff was not required to make a tender and had only to report that he was ready, willing and able to perform.   But in his complaint he pleaded not only that he was " ready, willing and able and offered to deliver the same to defendants," but also that he had duly performed all the conditions of the agreement on his part to be performed.

The testimony of plaintiff's witness, Levy, was that the plaintiff was in a position to deliver the balance of the goods within one week's time after demand; that the plaintiff had sufficient grey goods on hand; that the manufacturing and finishing thereof would take about five days and that the goods could be packed and shipped within a period of from five to seven days after notice; that the plaintiff was the sole selling agent for the mill.

In September, 1921, nearly nineteen months after delivery of the goods under the contract had ceased, Demov testified the following took place: "Q. What occurred at that time? A: I called Mr. Nauman up as usual, to give him my friendly greetings, and find out what the price of plush was, and his voice changed some. It was not as pleasant as during the months I had been dealing with him, calling him 'Fred,' and I says, 'What is the price of 537 plush?' He says, 'We have no 537 plush,' and that scared me, because I was not accustomed to him talking to me that way. I said, 'Just what do you mean?' He says, 'How is the balance on your order?' I says, 'What order?' He says, 'You know, that 1919 order.' I said, 'What? You are kidding me.' He says, 'No, I mean business.' I said, 'Why didn't you offer it for delivery in all these eighteen months, the goods that you had on hand, if you had it?' And I went on and I said, 'Did you have it in warehouse?' He says, 'I don't know, I will have to find out.' And, in order to let him cool off some I changed the subject. I said, 'Have you got any Number 537 white plush?' He said, 'We have no white plush, but when you are in the market for cinnamon, let me know,' and that was the end of that conversation. Q. Was anything said in that conversation about the cancellation having been made previously? A. Oh, yes; I said: 'You know that order was cancelled.' He said, 'I never had any talk with you about the cancellation, never spoke to you.'"

Meantime the price of plush had fluctuated widely. When the contract was made December 31, 1919, it was three dollars and thirty-five cents per yard.

William Praeger, an expert witness called by the plaintiff for the purpose of proving market price at the time of the alleged breach, testified on cross-examination that in February and March, 1920, No. 537 teddy bear plush was selling for three dollars and fifty cents per yard, and in the early summer of 1920 the price went as high as three dollars and seventy-five cents per yard. In October, 1921, when the defendants are claimed by plaintiff to have repudiated the contract as to the undelivered balance, the price had receded to two dollars per yard. The plaintiff's witness Nauman also testified that in October, 1921, the price per yard

was two dollars " and below." Plaintiff took no steps to enforce the contract as to the balance still undelivered while the price of plush was high, but when the price dropped the letters were written in September, 1921, by the credit company to defendants demanding that defendants take the goods which plaintiff was said to have been holding for them. Then on October 7, 1921, plaintiff, defendant Steinfeld, Demov, Levy, one Walkoff and Nauman were present at a conference concerning the sixty-seven pieces remaining undelivered, when Steinfeld positively refused to take any of the goods because he said he had canceled the order.

Undoubtedly there was an issue of fact as to whether the order had been actually canceled by consent of the parties, as testified to by Demov and denied by Nauman. The testimony being all given by interested witnesses, though the facts are persuasive in favor of defendants' version of the cancellation, it cannot be said that they preponderate so strongly in favor of defendants as to warrant a reversal of the judgment on the ground that the verdict of the jury in favor of plaintiff was against the weight of the evidence.

We must treat the case, therefore, as it is presented on plaintiff's theory that the defendants' letter of February 28, 1920, when acquiesced in by plaintiff, amounted only to waiver of performance of the contract within the time limit fixed thereby, and that neither party could rescind the contract on account of delay in performance without notice to the other requiring performance within a reasonable time after such notice, to be specified therein.

Such a contention, if sustained, would turn a request for a mere temporary suspension of delivery until storage space was available therefor, into a contract continuing indefinitely. It would turn a contract for the sale of goods into a speculation on market values, with either party at liberty to ignore the contract while market conditions were against it, and to assert its validity when conditions became favorable. Thus in the present case defendants treated the contract as canceled; plaintiff made no claim upon it during a rising market, but only when prices had fallen. Plaintiff never referred to it in any way or asserted any rights or claims thereunder for a period which concededly, upon the most favorable view of the testimony for him, lasted from May 3, 1920 (when Nauman claims he asked Demov to take in more goods), until September 8, 1921 (when the Merchants Credit Adjustment Company sent its first letter to defendants). This was a period of one year, four months and five days. The latter date is one year, six months and ten days after the original request to postpone delivery. To consider such a contract as automatically kept alive

indefinitely would be obviously unfair and be putting a premium on speculation rather than on business, particularly on merchandise such as plush, whose market value during the time covered by this controversy ranged from three dollars and thirty-five cents to three dollars and seventy-five cents per yard, and then sank as low as two dollars per yard. It seems to me that a contract can be kept alive under such conditions only for a reasonable time, and that during such time at least one of the parties to the contract must so act as to show that it deems it still valid, and must take some affirmative step in reference thereto.

In *Trainor Co.* v. *Amsinck & Co., Inc.* (236 N. Y. 392) the court said (at p. 395): " Where a contractor for the manufacture and sale of goods provides for delivery on a time fixed in the contract for the full completion thereof, and the seller fails to perform by the day so fixed, the buyer may insist on his strict legal right and put an end to the contract. If, however, he extends the time fixed for performance for an indefinite period, the buyer may not put an end to the contract on account of delay without giving notice to the seller that in default of performance within a reasonable time, to be specified in the notice, the contract will be abrogated.

" When by a contract to sell the seller is bound to deliver the goods to the buyer, but no time for delivery is fixed, the seller must tender them within a reasonable time. (Personal Property Law [Cons. Laws, ch. 41], § 124.)* Under this statute the contract such as the one in the case before us does provide for delivery at a future time just as effectually as if that future time was fixed by date. The duty of the seller is absolute. He has not been deceived by any action of the buyer, or led to believe that strict compliance with the contract is not to be insisted upon. The provision as to the delivery within a reasonable time is a condition. It may be waived, and, if waived, it may not again be imposed without notice. If not waived, however, the buyer may refuse to proceed with the contract."

Even accepting as true the testimony of plaintiff's witness Nauman that on May third he had a conversation with defendants' buyer Demov, in which he asked Demov whether he could take in some goods, it seems to me that the contract was kept alive to be performed within a reasonable time thereafter. It is shown that nothing was done by plaintiff until September of the following year. It seems to me that the learned trial court should have determined that as a matter of law plaintiff made no tender

---

* Added by Laws of 1911, chap. 571, known as the Sales of Goods Act.—[Rep.

of performance within a reasonable time. It is true that in February defendants asked plaintiff to hold up shipment until advised. This meant an extension of time of performance beyond the date originally fixed for a reasonable time thereafter. Then on May third, according to plaintiff, there was a further extension. There must be some mutuality about the " reasonable time " rule.

In *Wichert* v. *Stafford* (25 Ill. App. 218) the plaintiff agreed to deliver to the defendant at the defendant's place of business a quantity of pickles " in lots as wanted up to December 15, 1884." The plaintiff asked the defendant to take the pickles, and had sent them to defendant's store to be delivered on the contract, but the defendant sent them back, saying he had no room for them and had requested plaintiff not to send him any more pickles until he ordered them. Plaintiff also offered proof tending to show that he had all the pickles called for by the contract on hand or under his control, and ready to deliver to defendant on the last day of the contract, if he should call for them.

The appellate court reversing a judgment for plaintiff said: " If the defendant or his agents told plaintiff not to deliver pickles on said contract unless they were ordered by him and plaintiff acted on such direction and acquiesced therein, then the element of time in the contract would have been waived by the parties.

" In such case where a fixed time has ceased to be an element in the contract, neither party can put the other in default without some notice or demand of performance. *Lawson* v. *Hogan,* 93 N. Y. 44.

" The element of time is enlarged from a definite or fixed time to a reasonable time in which to perform the contract, and the defendant could not in such case be put in default unless he refused to receive the pickles on a tender of delivery within a reasonable time, and the plaintiff in order to recover would be required to show an ability to perform and an offer or tender of performance within such reasonable time."

Prof. Williston, in his Work on Contracts (Vol. 1, § 38, p. 58) says: " It is not often that a promise will properly be construed as calling for perpetual performance. Only in such negative promises as to forbear suit or not to carry on a business or occupation is so broad a construction likely to be permissible. More commonly the true construction will mean some period short of infinity; and partly in order to carry out supposed actual intention of the parties and partly, doubtless, in order to prevent an offer or agreement from being ineffectual because too indefinite, courts will, where the contract contemplates a single act or exchange of acts unless the circumstances show a contrary intention, construe

a promise which does not in terms state the time of performance as intending performance in a reasonable time."

A well-considered case in point is *Pearl Mill Co.* v. *Ivy Tannery Co.* (L. R. [1919] 1 K. B. 78). In 1913 the Pearl Mill Company made a contract of sale for the purchase from the tannery company of fifty dozen roller skins, " delivery as required." Up to September, 1914, twenty dozen skins had been delivered at the request of the mill company, leaving thirty dozen skins undelivered. Thereafter both parties ignored the existence of the contract until July, 1917, or for a period of about twenty-one months, when the plaintiff wrote to the defendant requesting delivery of the remaining thirty dozen skins. The defendant refused to deliver the skins and the plaintiff brought suit. From a judgment in the lower court for the defendant on the ground that the contract had expired, the plaintiff appealed.

On appeal the plaintiff urged that the rule laid down in *Jones* v. *Gibbons* (8 Ex. 920) applied and that the contract could not expire until the defendant had given notice of its intention to terminate the same. In the *Pearl Mill Company* case, however, the Court of Kings Bench held that the rule of *Jones* v. *Gibbons* did not apply, and ROWLATT, J., in sustaining the decision of the lower court that the contract had expired by abandonment, is reported to have said: " The question is whether *Jones* v. *Gibbons* in effect lays down the proposition that a contract of this kind cannot come to an end by reason of lapse of time without steps being taken such as the notice being given which is mentioned in that case. I do not think it does anything of the kind.  *  *  *  That case is not the same as the one we have to consider, which does not turn in that sense upon merely the lapse. of a reasonable time but upon a lapse of time which may be very much more than that which would be a reasonable time for the purposes of the question in *Jones* v. *Gibbons*, viz., a lapse of time, allowed, to pass by both sides, so long as to induce the court to draw the inference that both parties thought that each of them had treated the contract as at an end. As I understand it, the learned County Court judge took that view. He held that there were two entirely different ways in which the contract could be put an end to — one by the machinery of *Jones* v. *Gibbons*, and the other by the operation of the principle which, although the facts and the form of the application of it are entirely different, is the principle to be found in cases like *Freeth* v. *Burr*, L. R. 9 C. P. 208, that is to say, when each party apprehends that the other abandons the contract. He held that the latter principle applied to the present case — that is, that there had been not merely the lapse of a reasonable time giving an option

to the vendee to determine the contract by notice, but that the lapse of time had been so long on both sides that he thought that the proper inference to be drawn was that each party was justified in assuming that the matter was off altogether.  *  *  * ''

McCardie, J., in a concurring opinion said: " I think that the point before us is one of considerable commercial importance. The words ' as required ' appear in a very large number of commercial contracts throughout the country. Those words were interpreted in *Jones* v. *Gibbons,* and it was held that the mere lapse of a reasonable time did not entitle the vendor to put an end to the contract, but that before he could take that course he must give notice to the vendee. I regard *Jones* v. *Gibbons* as a well settled and weighty authority, but in my view it in no way conflicts with other and well known principles of law, such as that which permits parties to rescind, or that which leads the court to infer the abandonment of contractual obligations. Contracts for the sale of goods frequently require the performance of acts by a vendee before the obligation of delivery falls or becomes imperative upon the vendor — for example, where the class of goods, the size, or the quantities must be specified by the purchaser. In such a contract where the words ' as required,' or the like words, do not appear, then upon the passing of a reasonable time the vendee will have lost his right to call upon the vendor to deliver; but where the words ' as required ' appear a particular duty is cast upon the vendor by virtue of the decision in *Jones* v. *Gibbons.* Reasonable time is of course a matter which depends upon the nature of the contract, its terms, the class of goods, the practice of the trade, and the general circumstances of the case. In my opinion, where the contract is one to which *Jones* v. *Gibbons* applies it is clear that the mere lapse of a reasonable time does not *ipso facto* deprive the vendee of his rights, but that rule in no way prevents the operation of the other rules of law which are applicable to contracts. Mere delay or the mere lapse of reasonable time is one thing, but an inordinate lapse of time is wholly different. The former may not give rise to the implication of abandonment, the latter may do so.''

In the case last cited the period which elapsed without action by either party was twenty-one months; in the present case it was either sixteen or eighteen months, depending on the view taken of the testimony.

I am of the opinion that in no event could the extension of the contract in the case at bar be regarded as an extension for more than a reasonable time, and where both parties have ignored the existence of the contract for a period of over sixteen months, as

a matter of law it is deemed to have been terminated by mutual abandonment.

The judgment and order appealed from should, therefore, be reversed, with costs to appellants, and the complaint be dismissed, with costs.

CLARKE, P. J., MERRELL, McAVOY and MARTIN, JJ., concur.

Judgment and order reversed, with costs, and complaint dismissed, with costs.